Filed 9/20/13  P. v. Love CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID LEE LOVE et al.,<br><br>        Defendants and Appellants. | E055359<br><br>(Super.Ct.No. FSB1003542)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed in part; reversed in part.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant David Lee Love.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant David Edward Couzens.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Lilia E. Garcia and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant David Lee Love appeals from his conviction of kidnapping (Pen. Code,[1] § 207, subd. (a); count 2) and attempted robbery (§§ 211, 664; count 6), with true findings on allegations of three prior prison term convictions (§ 667.5, subd. (b)). Love contends (1) the evidence was insufficient to support his conviction of kidnapping, and (2) the evidence was insufficient to support his conviction of attempted robbery We find no error, and we affirm the judgment as to Love.

Defendant David Edward Couzens appeals from his conviction of kidnapping (§ 207, subd. (a); count 2), kidnapping to commit robbery (§ 209, subd. (b)(1); count 3), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 4), and battery with serious bodily injury (§ 243, subd. (d); count 5) with true findings on allegations of great bodily injury (§ 12022.7, subd. (a); as to counts 2 through 4) and a prior strike conviction. (§ 1170.12, subds. (a)-(d)). Couzens contends his sentence for assault must be stayed under section 654, and he argues his sentence violated constitutional protections against double jeopardy. He also argues the matter must be remanded for appointment of counsel to investigate and file, if appropriate, a motion for new trial based on ineffective assistance of counsel.[2] We conclude Couzens's conviction

---

[1] All statutory references are to the Penal Code.

[2] Each defendant joins his codefendant's arguments to the extent they benefit him. However, because each defendant's arguments are personal, there is no benefit to such joinder.

of simple kidnapping must be reversed because it is a lesser included offense of kidnapping for robbery. We find no other errors.

## II. FACTS AND PROCEDURAL BACKGROUND

About midnight on August 20, 2010, two women flagged down Steve Madsen, who was driving his truck in San Bernardino. The women said they were scared, and they asked him for a ride home. The older woman, Rachel Delgado, got into the front passenger seat, and the younger woman, Ashley Contreras, got into the rear seat. After Delgado gave directions, which appeared to lead in a circle, Madsen told the women they needed to get out. Delgado said they were only a couple houses away, and Madsen stopped in front of a house she indicated on Ninth Street. As the women got out, Delgado moved slowly and looked to her right; she left the front passenger door open. She said to Contreras, "Let's get out of here." The two women headed west on Ninth Street.

Suddenly, Couzens appeared at the open door of the truck with his right arm bent behind his back. He yelled, "What the fuck are you doing with my wife and daughter[?]" Madsen said he was not doing anything, and Couzens said, "I am going to fucking kill you. Get out of the car." Madsen believed Couzens was holding a gun behind his back. At Couzens's order, Madsen turned off the engine and the lights and got out of the truck. Couzens again asked what Madsen had been doing with his wife and daughter. Madsen replied that it was a misunderstanding, and he would give Couzens whatever he wanted.

Couzens grabbed Madsen's arm and pulled him towards an abandoned house. Couzens kept repeating that he was going to kill Madsen. Madsen said he had a wife and

3

kids and asked Couzens not to hurt him. Couzens said, "Don't—don't fuck with my—nobody fucks with my wife." He held Madsen by the throat and kept shoving him against the wall. Madsen kept pleading and said he could get money for Couzens. Couzens reached into Madsen's pockets and demanded his money. He took all of Madsen's money and his watch.

Couzens was still holding Madsen against the wall and grabbing his throat when Love entered from another room inside the house; he appeared to be surprised. Couzens punched Madsen on the face with his forearm. Love, sounding "mean and pissed off," asked what was going on. Madsen continued pleading; he offered the men anything they wanted, and he said if they went to an ATM (automated teller machine), he could get the men $500 apiece. Love said, "Let him. Let him get us the money," and "Let's let him go to the ATM."

Couzens demanded Madsen's wallet, and Madsen complied. Couzens then said, "Let's go to the fucking bank." Couzens and Love followed Madsen to his truck, and Couzens said, "You do something stupid, I will kill your whole fucking family." Once at the truck, Couzens told Love he could not go because he had warrants, but that Love should go with Madsen while Couzens waited at the house. Love got into the passenger seat of the truck. Madsen said he needed his wallet back to get them the money. Couzens returned the wallet. When Madsen got in the truck, Couzens demanded that he return the wallet. Couzens took Madsen's "Triple A" card and then returned the wallet, saying, "Now I have your name, and if you do anything stupid, I am going to kill you and your family."

4

Madsen was bleeding from his upper lip. He reached for his gym bag to get a towel, and Love asked what he was doing. When Madsen explained, Love said, "Okay. Get a rag, then." Madsen got a towel and pressed it to his lip, then started driving. Love gave him directions and said, "Just get the money and get back. I am not fucking a part of this." He kept telling Madsen not to do anything stupid. Madsen was scared because he did not know if Love had a weapon. Love pointed out a mini mart that had an ATM, but Madsen said he could not get enough money there, and they needed to go to a bank.

Madsen saw a police car coming up the other side of the street. Love repeated, "Don't fucking do something stupid," but Madsen made a U-turn. Love opened the door to try to jump out, but Madsen was going too fast, and Love closed the door and told him, "You are fucking dead." Madsen stopped in front of the police officer and jumped out with his hands in the air, saying, "Help, they are trying to kill me." Love was arrested at the scene.

Madsen accompanied officers back to the house on Ninth Street. On the way, he saw Couzens walking down the street and pointed him out to the officers. Couzens had fresh scrapes on his knuckles. Delgado and Contreras approached, and Madsen identified them as the women to whom he had given a ride.

Madsen was treated at the hospital for a blunt force injury to his lip; the laceration had cut the labial artery, and the wound was closed with stitches.

Delgado pled guilty to second degree robbery in connection with the instant case. As part of her plea bargain, she was released the same day with a lid of six months in county jail and three years' felony probation, contingent on her truthful testimony. At

5

trial, Delgado that testified Couzens was her boyfriend, and Contreras was her niece.  On the night of August 20 they were homeless and were going to spend the night in an empty house on Ninth Street.  Delgado testified she had never seen Love before.

## A.  Verdicts and Sentences

### 1.  *Love*

The jury found Love guilty of kidnapping (§ 207, subd. (a); count 2) and attempted robbery (§§ 211, 664; count 6).  The trial court found true allegations of three prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced Love to a total term of five years in prison.

### 2.  *Couzens*

The jury found Couzens guilty of kidnapping (§ 207, subd. (a); count 2), kidnapping to commit robbery (§ 209, subd. (b)(1); count 3), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count 4), and battery with serious bodily injury (§ 243, subd. (d); count 5), and found true allegations of great bodily injury (§ 12022.7, subd. (a); as to counts 2 through 4).  The jury found defendant not guilty of robbery (§ 211) charged in count 1.  The trial court found true the allegation of a prior strike conviction (§ 1170.12, subds. (a)-(d)).

The trial court sentenced Couzens to a term of 14 years to life for the kidnapping for robbery, a consecutive term of four years for assault, and a consecutive three-year enhancement for the great bodily injury allegation as to the assault count.  The court stayed his sentences for simple kidnapping and battery under section 654.  Finally, the

6

court imposed a five-year consecutive term for the prior serious or violent felony conviction.

## III. DISCUSSION

### A. Section 654

Couzens contends his sentence for assault must be stayed under section 654 and that the sentence violated constitutional protections against double jeopardy. He argues the case was submitted to the jury on the prosecutor's theory that he moved Madsen and struck him in the face, causing great bodily injury, for the purpose of robbing and kidnapping him, and he had a single intent and objective.

#### 1. Additional Background

During closing argument, the prosecutor contended that the injury to Madsen's lip was great bodily injury. As to the assault charge, the prosecutor argued, "You heard testimony that Madsen told you that he was struck in the face by either the fist or forearm of Mr. Couzens. That's an application of force. The second thing is that the force used was likely to produce great bodily injury. You hit someone in the face, that's a possibility. We have another thing that helps prove this, which is he's bleeding all over the place and needs stitches. So the actual injury in and of itself, you can look at it to see whether the force used was . . . sufficient to produce it."

As to the kidnapping charge, the prosecutor argued that the jury could convict Couzens based on the fact that Couzens initially simulated a weapon to force Madsen to enter the house: "So to be guilty of kidnapping, you hold, detain, take another person by using force or instilling fear. Okay. Back at the car, Couzens, Get out of the car or I'm

7

going to shoot you. Spinning him around, walking him up there, that's taking somebody and moving them by force or fear."

As to the kidnapping for robbery count, the prosecutor argued: "[T]here are two separate incidents which you could find him guilty on this. One is from the truck to the house. He takes Madsen out of the truck into the house, and then takes money and property from him by force. The second one is getting him out to the car and to the ATM, because it's also his—his words, If you don't come back, I'm going to kill you and your family. It's also the fact that now Madsen knows he's bleeding. It's force and fear used earlier that's also the driving wind."

The trial court imposed a life term for the kidnapping for robbery count, a consecutive term of four years for the assault count, and a consecutive enhancement of three years for the great bodily injury allegation as to the assault count. The trial court stayed the sentence for simple kidnapping under section 654, finding that the count "spr[ang] from the same objective and intent as the kidnapping for robbery." The trial court also stayed the sentence for battery, finding it had the "same objective and intent" as the assault.

### 2. *Section 654*

Section 654 prohibits multiple punishments for a single act or indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) Whether a series of acts constituted an indivisible course of conduct depends on the intent and objectives of the defendant. "'[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a

8

single intent and therefore may be punished only once.  [Citation.]'  [Citation.]" (*People v. Hicks* (1993) 6 Cal.4th 784, 789.)  The defendant's intent and objective are factual questions for trial court, and we uphold the trial court's finding, whether express or implied, if there is sufficient evidence to support it.  (*People v. Vang* (2010) 184 Cal.App.4th 912, 915-916.)  We review the record in the light most favorable to the trial court's finding and presume the existence of every fact the trial court could reasonably deduce from the evidence.  (*Ibid.*)

Section 654 "cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191 (*Nguyen*).)  In *Nguyen*, the defendant and a confederate entered a market.  While the defendant emptied the cash register, the confederate took the store clerk to a rear bathroom, robbed him of money and a passport, forced him to lie on the floor, and then kicked him and shot him in the back.  (*Id.* at p. 185.)  The defendant was convicted of robbery, assault with a deadly weapon, and attempted murder based on that incident.  (*Id.* at pp. 184-185.)  On appeal, he argued his consecutive sentences for attempted murder and robbery violated section 654.  (*Nguyen*, *supra*, at p. 189.)  The court rejected that argument, holding that "a separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found not incidental to robbery for purposes of section 654."  (*Id.* at p. 193.)

Here, Madsen did not resist when Couzens pulled him into the house, grabbed him by the throat, shoved him up against the wall three or four times, and repeatedly said that

9

he was going to kill Madsen and that Madsen was a dead man.  Madsen did not resist when Couzens reached into his pockets, took his money, and grabbed his watch.  After seizing Madsen's property, Couzens again shoved Madsen up against the wall and struck him in the face with a forearm, causing the lip injury.  Based on that evidence, the trial court could properly conclude that Couzens's act of gratuitous violence against an unresisting victim was not incidental to the other crimes for purposes of section 654.  (*Nguyen*, *supra*, 204 Cal.App.3d at p. 193.)  There was no error in imposing a separate sentence for the crime of assault.

### 3.  *Double Jeopardy*

The double jeopardy clause of the Fifth Amendment prohibits multiple punishments for the same offense.  (*People v. Wader* (1993) 5 Cal.4th 610, 670.)  The jeopardy doctrine (U.S. Const., 5th Amend.; Cal. Const., art. I, § 13; Pen. Code, § 1023) and the prohibition against multiple punishment (Pen. Code, § 654) "'are neither identical shields nor (properly applied) do they overlap.'  '"[N]o plea of double jeopardy can properly be made where the defendant is tried but once."'  [Citation.]  'Where a prisoner is tried but once on several counts arising out of the same facts occurring at the same time, "double jeopardy" is impossible.'  [Citations.]"  (*People v. Polowicz* (1992) 5 Cal.App.4th 1082, 1088.)  Hence, neither defendant's conviction of nor punishment for both assault and kidnapping for robbery violated the constitutional prohibition against double jeopardy.

However, "In this state, multiple convictions may not be based on necessarily included offenses arising out of a single act or course of conduct.  [Citations.]  An offense

is necessarily included within another if 'the statutory elements of the greater offense . . . include all the elements of the lesser offense . . . .' [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 518.) "[S]imple kidnapping is a necessarily included offense of kidnapping to commit robbery, the latter having an additional element of intent to rob that arises before the kidnapping commences. [Citation.]" (*Ibid.*)

On our own motion, we note that Couzens was convicted in count 2 of simple kidnapping (§ 207, subd. (a)) and in count 3 of kidnapping to commit robbery (§ 209, subd. (b)(1)). Even though the trial court stayed his sentence for simple kidnapping under section 654, the proper remedy is to reverse defendant's conviction for that count because it was a necessarily lesser included offense of kidnapping for robbery. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 518.)

**B. Ineffective Assistance of Counsel**

Couzens contends the matter must be remanded for appointment of counsel to investigate and file, if appropriate, a motion for new trial based on ineffective assistance of counsel.

*1. Additional Background*

(a) First *Marsden* hearing

After Couzens's conviction, he requested a *Marsden*[3] hearing. At the hearing on September 29, 2011, defendant argued that his trial counsel (1) should have filed a motion under section 995, (2) retained jurors defendant did not want retained, and

---

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

11

(3) failed to call two witnesses who would have assisted in his defense. He asserted that one witness would have testified that Madsen got out of his vehicle and followed the women into the house of his own accord. He asserted the second witness would have testified that Couzens and Love did not know one another before the incident, and Couzens did not even know that Love was in the abandoned house.

The court asked Couzens's counsel to explain about the witnesses. Defense counsel acknowledged he knew of the first witness, Martell Lott, had named him on his witness list, and had subpoenaed him for trial. Lott had appeared twice in response to the subpoena, and the court had twice ordered him back, but he eventually "just stopped showing up." Counsel noted that Couzens had complained that counsel did not send the sheriff out, but counsel stated he had no control over the sheriff. Counsel did inform the prosecutor, who said he also was trying to find Lott. Counsel stated he was not sure of the name of the second witness Couzens had wanted him to call, but Love's counsel had the name, and counsel knew Love's counsel "was making every effort to secure her presence."

The trial court denied Couzens's motion for appointment of substitute counsel. The court explained that the decision whether to file a motion under section 995 was a tactical decision reserved to counsel, and it was counsel's job to pick the jurors.

(b) Second *Marsden* hearing

Couzens's counsel filed a motion for new trial on the grounds of insufficiency of the evidence of the crimes of kidnapping and kidnapping for robbery. After the trial court denied the motion, Couzens requested another *Marsden* hearing. At the hearing,

12

Couzens complained that his counsel had advised him to reject a pretrial plea offer. Couzens claims his counsel had repeatedly told him there would not be a robbery charge or a life sentence and that he would go to prison only for the assault, which Couzens admitted. Couzens's counsel responded that he had told defendant he should take the plea offer of five or six years, and counsel had made a counteroffer of four years. Counsel stated his practice was not to encourage anyone to take a deal or not take a deal, and he would never have guaranteed a win at trial. Counsel denied ever telling Couzens that the only thing he would go to prison for would be the assault. The trial court found counsel's representation credible and found no evidence counsel had provided ineffective representation. The court denied the request for substitute counsel.

Just before Couzens's sentencing, his counsel requested to state an additional point for the record concerning Couzens's *Marsden* request. Counsel denied ever assuring Couzens he would not receive a life term and represented that he had advised Couzens to accept the offer of a six-year term, but Couzens had rejected the offer. With respect to counsel's decision not to pursue Lott as a witness, counsel stated he believed Lott's information was already covered by the victim or another witness, and because Lott had been convicted of a felony, his testimony would weaken rather than bolster the defense argument.

### 2. Analysis

When a defendant requests substitution of appointed counsel, the trial court must allow him to "'explain the basis of his contention and to relate specific instances of inadequate performance.'" (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) A defendant

13

is entitled to relief when the record "'clearly shows'" that counsel is not providing adequate representation or that an irreconcilable conflict exists between counsel and the defendant. (*Ibid.*) We apply an abuse of discretion standard when reviewing the trial court's denial of a *Marsden* motion. (*People v. Streeter*, *supra*, at p. 230.)

In *People v. Vines* (2011) 51 Cal.4th 830, the defendant contended the trial court erred in denying his posttrial *Marsden* motion. The defendant complained, among other grounds, that his counsel had been ineffective for failing to call a potential defense witness who had given the police a description at odds with defendant's appearance. (*People v. Vines*, *supra*, at p. 877-878 & fn 23.) The Supreme Court held that "counsel's reason for not doing so—that he could not locate him—was a sufficient response to defendant's complaint." (*Id.* at p. 878.) Here, counsel subpoenaed Lott and discussed with the prosecutor the prosecutor's efforts to locate him. A warrant was issued for Lott. The trial court could properly conclude that counsel took adequate, albeit unsuccessful, steps to obtain Lott's presence at trial. Moreover, at the January 20, 2012, hearing, counsel stated his belief that Lott's testimony would merely have been cumulative to that of another witness, and Lott's felony conviction would have made him an unconvincing witness.

The trial court found counsel's other explanations credible and satisfactory, and we agree with that finding. As the trial court pointed out, the decision whether or not to file a motion under section 995 was a tactical decision for counsel, and it was likewise counsel's responsibility to select the jury. A defendant's disagreement with counsel's tactical decisions does not entitle him to substitute counsel.

14

In sum, the trial court conducted hearings at which Couzens was given a full opportunity to state the reasons for his dissatisfaction with trial counsel, following which counsel responded. Nothing more was required under *Marsden*. We conclude the trial court did not abuse its discretion in denying the motion.

**C. Sufficiency of Evidence of Kidnapping and Robbery**

Love contends the evidence was insufficient to support his conviction of kidnapping. Love argues that he lacked criminal intent and did not use force or fear, and Madsen's movement was consensual. Love also contends the evidence was insufficient to support his conviction of attempted robbery because he lacked specific intent to rob Madsen.

*1. Standard of Review*

When a criminal defendant contends the evidence was insufficient to support his conviction, "'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] . . . The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

*2. Kidnapping*

"Consent of the victim is no defense where the consent is induced by coercion . . . ." (*Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 409.) "The force

15

used against the victim 'need not be physical. The movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.' [Citations.]" (*Id.* at p. 402.) The jury was instructed as to counts 2 and 3 that the People were required to prove, among other elements, that "[t]he other person did not consent to the movement," and "[t]he defendant did not actually and reasonably believe that the other person consented to the movement." The jury was instructed that "[i]n order to consent, a person must act freely and voluntarily and know the nature of the act." (Italics omitted.) The instruction continued: "The defendant is not guilty of kidnapping if he reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement. If the People have not met this burden, you must find the defendant not guilty of this crime. [¶] The defendant is not guilty of kidnapping if the other person in fact consented to go with the defendant. The other person consented if he (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient mental capacity to choose to go with the defendant. The People have the burden of proving beyond a reasonable doubt that the other person did not consent to go with the defendant."

Love argues it was undisputed that he and Couzens did not act together and did not even know each other. He notes that the idea of getting money from an ATM to give to defendants originated with Madsen, and he asserts he accompanied Madsen only

16

because Couzens refused do to so because he had warrants out against him.  Love further argues that he "made statements and engaged in conduct that was utterly inconsistent with an intent to kidnap or rob Madsen, including permitting Madsen to get a rag for his injured face, and stating that he 'was not fucking a part of this.'"

Love omits discussion of other substantial evidence that supported his guilt. When Love entered the room, Madsen was pinned against the wall with Couzens grabbing his throat.  Couzens struck Madsen in the face, severing his labial artery. Madsen was pleading for his life.  It was under those circumstances that Madsen offered to go to an ATM and bring $500 for each defendant, and Love, who was standing next to Couzens, said, "Let him.  Let him get *us* the money."  (Italics added.)  When Love was sitting in the passenger seat of Madsen's truck, Couzens demanded that Madsen hand over his wallet.  Couzens took out a card and returned the wallet, saying that he now knew Madsen's name and would kill him and his family if he did anything stupid. Couzens warned Madsen he "better be right back."  During the drive, Love gave directions where to turn and told him, "[d]on't do something fucking stupid."  Love pointed out a mini mart that had an ATM, and when Madsen said it would not have enough money, and they needed to go to a bank, Love again told him not to do anything stupid and that they were "going to just go straight to the [bank]."  When a police car approached, Love again told him not to do anything stupid.  When the police car stopped, Love tried to jump out, and angrily told Madsen, "You are fucking dead."  Madsen's lip was bleeding throughout the incident.

17

From the above evidence, the jury could reasonably determine it was apparent to Love that Madsen was not a willing participant in the attempted robbery and the kidnapping, and that Love's own words and conduct were coercive. In other words, ample evidence supported a jury finding that Love did not act in a good faith belief in Madsen's consent. Even if Love's involvement was initially opportunistic, the jury reasonably determined that Love seized the opportunity and joined the crimes with the required specific intent.

### 3. Attempted Robbery

Love contends the prosecutor's theory at trial was that Love was guilty as an aider and abettor, not as a direct perpetrator, of attempted robbery. He argues that the evidence was insufficient to establish that he had the specific intent to rob Madsen.

Conviction as an aider and abettor requires proof that the defendant acted with knowledge of the perpetrator's criminal purpose, that he intended to commit, encourage, or facilitate the offense before the commission of the crime, and that he actually aided, facilitated, promoted, encouraged, or instigated the perpetrator's commission of the crime. (E.g., *People v. Beeman* (1984) 35 Cal.3d 547, 560.)

The evidence set forth above in our discussion of the kidnapping count likewise amply supports Love's conviction of attempted robbery. The jury could reasonably determine that Love's words and actions indicated he had the specific intent to rob Madsen.

18

## IV.  DISPOSITION

Defendant Couzens's conviction of simple kidnapping is reversed.  In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


                                                    HOLLENHORST
                                                              Acting P. J.

We concur:

MCKINSTER
                    J.

MILLER
                    J.